Hanging with us. Next measure is Ponzini v. Monroe County. Good morning, Your Honor. Good morning. May it please the Court, my name is Brian Chakran, along with my father, Ed Chakran. I know your dad, I don't know you. It's a pleasure to meet you, Your Honor. I've known your dad for many years. I can't help you, by the way. I can't hurt you, either. Most of the time it helps me. I'll take neutral, too. We have the privilege of representing Miriam Barbaros and Peter Ponzini, co-administrators of the estate of Moomin Barbaros, deceased in this wrongful death case. I'd like to reserve five minutes for rebuttal, with the Court's permission. This is an appeal from the District Court's grant of JNOV on the jury's punitive damages award of $8 million. There's also a cross-appeal issue, Your Honors, where Defendant Prime Care Medical has raised the challenge to the sufficiency of a specific jury charge that it contends was a negligence per se charge. So with the Court's permission, it's my intention to focus my argument on the punitive damages at this point and reserve response to the appellate issue on rebuttal. I'll ask your adversaries, i.e. friends, the same question. Was the JNOV, as the punitive damages, was that ever moved for? Was it preserved? So, Your Honor, my position, and I believe even the Court noted as it corresponded to the issue, that it was, at best, not the modicum of what a Rule 50 motion should look like. But was it enough? In my view, Your Honor, no, it wasn't, because the purpose of Rule 50 is to put, and as the comment notes and as the case laws note, the purpose of a Rule 50 motion is to put the legal basis and factual basis for your argument on the record. And the reason you do that is because you want to give the plaintiff, in this case, the opportunity to correct the record if there is additional evidence that needs to be brought. In this case, what happened was, at the end of Plaintiff's case in Chief, there was no motion based on punitive damages. At the close of the case, at the close of the evidence, there was no motion on punitive damages. What happened was, over that following evening, we made the determination to withdraw punitive damages claims against the individual defendants, and on the federal claim, and focused the punitive damages on the state law corporate negligence claim against prime care. And it was only after doing that, in passing, that counsel for prime care said, by the way, Judge, we just want to make sure you know, we are not going to do that. We don't think there should be punitive damages. I'm paraphrasing. I'm not quoting, Your Honor. And that was the extent of it. This was immediately after the jury charge conference. This was right as we were going into closing arguments. There was absolutely no opportunity and no basis for the plaintiffs to have an opportunity to present any additional evidence, nor to know why prime care thought it was deficient. Because understand, the lens of this, Your Honors, is that there were motions for summary judgment and motions in limine on punitive damages, all of which were denied by the court. And all the facts that were referenced in opposing those motions were established at trial. It sounds like it came as a surprise to you. It was a complete surprise. But you were in court when it happened. We were. And when the judge made, I would say, his decision, am I accurate? Yes, Judge Robert Mariani. You didn't object at that time. He didn't make a decision at that time. Don't worry about the point that he did make a decision. That was only after and post-trial motions. So that was after trial was over. Judge Mariani reserved ruling on every motion until after the jury returned its verdict. Okay. That's not uncommon. There's no criticism of that, Your Honor. But my point is, because there was no basis, and in fact, what counsel for defendant prime care said at trial was, and Your Honor, I don't need argument on it. On it being JNOB as to the punitives? On his Rule 50 motion as to the punitives at the time of trial. Well, on his statement that, by the way, we are objecting, we don't think there should be punitives at the time of trial. So there was no explanation of what factual issue they felt was deficient. Because if you look at the facts of this case, what I would submit to Your Honor is even if the court properly found that it had been preserved, which we submit it wasn't, but even if it had been preserved, the facts of this case meet the minimum quantum of evidence sufficient to leave the matter of punitive damages to the jury. Because what we're talking about here is a jury that deliberated for hours and made conscious decisions in its verdict. And by way of example, what I mean is, and I know before this court today, we have walked away, we have withdrawn our appeal on the Section 1983 decision, although we disagree with it, but we've withdrawn it. But I pointed out for an important reason. The court charged the jury on deliberate indifference. It charged it on punitive damages under state law. And what the jury did was it found that every individual defendant and prime care was deliberately indifferent, with the exception of the health services administrator, Wendy Johnson. It found that she was only negligent. James is a nurse. Johnson is the health services administrator. Correct. And so what we have here is a jury that clearly paid attention to the rule of law, listened to the jury charge, and heard the judge's instruction on punitive damages under state law. Because there was no objection to that language. So the language is, was there willful? Viewing the facts in a light most favorable to the plaintiffs as the prevailing party and the non-moving party, giving all reasonable inferences, did we meet the minimum quantum of evidence to allow a jury to decide whether prime care was willful, had a subject awareness, and was willful in its acts, and was recklessly indifferent? And the evidence in this case, especially if you review it in the context of the district judge's opinion, shows that he did not give the plaintiffs the benefit of every inference. Not only that, he didn't even consider four clear pieces of evidence that show willful acts on the part of prime care. And if I may, I'd like to point to the court. You're satisfied with the compensatory damages, I gather? There's no issue as to the compensatory damages. What was the amount? $2.8 million. So it was $800,000 for the survival and $2 million for the wrongful death. So the punitive is basically a multiple of four? Just over two. Just over a multiple of two. It's $8 million. The total compensatory verdict, remember, was about $4 million. The judge's reason was that it was excessive or it wasn't justified? No, the judge made a decision that, in his view, the facts did not meet the outrageous or recklessly indifferent minimum quantum. And you say that's wrong because? That's wrong because he didn't consider a number of acts. So there are four willful acts that we believe clearly show knowledge and intent on the part of prime care. First, at the time of trial, there was testimony from William Bufton, who is a psychologist, who worked at the Monroe County Correctional Facility. And when he testified, he said, I am an unlicensed psychologist. But while I'm at the Monroe County Correctional Facility, I am providing psychologist services. I know, and prime care knows, that I am required by law to be supervised by a licensed psychologist. But that prime care intentionally designated me a mental health worker to avoid the need to supervise me. That is an intentional act. Avoid the need to supervise me or to avoid the need to hire somebody who is licensed? Well, he can't speak for prime care. He is the psychologist. Again, we're talking about the reasonable inferences here, what a jury can draw from that information. And so what we know is that prime care knew it was legally required and obligated to supervise me. And that they intentionally designated him not as a psychologist. How did that result in an outrageous act or an act that would justify punitive damages? Sure. Well, if you look at the testimony that Mr. Bufton gave at the time of trial about what his actions were that day. So the first thing you see is that he did not perform a suicide assessment. He did not review his patient's past medical history. He did not perform a physical assessment. Not that he is required to perform a physical examination, but to ask about physical... In other words, had he done the things he was supposed to do, it would have avoided a suicide. And medication, for example. Absolutely. And performing the correct medical tests. And had he been trained... Had he been supervised. Yes, but it goes beyond that. Okay, but what is supervision for a licensed psychologist or unlicensed psychologist? It doesn't mean you have someone standing by your side at every moment. Absolutely not. Agreed. However, he testified, Mr. Bufton testified, no one ever reviewed his charts. No one ever sat in on a single visit. He testified that he knew, and importantly, prime care puts on its website that its mental health workers are familiar with suicide protocols and policies. But he testified that he was never taught them. He wasn't required to know them. And prime care told him he didn't have to know them. Now, this is an example. This is just one example of prime care making a willful decision not to supervise. The evidence was that he was supervised by a licensed social worker who actually didn't supervise him. All she did was schedule his appointments. Things were so bad for this... If he's being supervised by a licensed psychologist, that doesn't happen. If he's being supervised as required, and by the way, also required by the NCCHC, the National Commission on Correctional Health Care Standards, their own expert, Dr. Wills, testified that Mr. Buckton was required to be supervised. I'm sorry, were there other... You said there were four. There are three other examples, yes. Could you list them? Absolutely. No, that's fine. Second, there is testimony from a Nurse Ramos. And Nurse Ramos testified that there were repeated requests by the nursing staff to have additional staff during each shift. So there was a shortage of staff. Absolutely. Nurse Ramos also testified that the nursing staff repeatedly asked prime care to have additional doctors on premises more than once a week. Shortage of doctors. But that's part of the shortage of staff. Well, no. That's two separate issues. So one is shortage of nursing staff, and two is shortage of doctors on premises with sufficient frequency. Because what she said was, yes, there are doctors on call that you can call, but they never review the records. I read somewhere that the nurses were staffed primarily with LPNs, who were not as effective, I guess, in diagnosing problems as registered nurses. That's my last point, Judge. That's the fourth point. Prime care is governed by what's called the Practical Nursing Law. They acknowledge that the purpose of the Practical Nursing Law is to protect the health and safety of patients being treated by nurses, LPNs, RNs, licensed practical nurses, registered nurses, and there are different levels of nurses in Pennsylvania. That's the very purpose of the rule. So the converse of that rule is, if you're not going to comply with the act, you know that you're putting your patients at risk. And so what we have here is, Prime Care admitted at trial, through its corporate designee, that it knew that its LPN, its health services administrator, would be supervising the nursing staff. Well, but was she going to be supervising them administratively? Was she going to be doing their schedules? Was she going to be supervising their professional services? She was going to be doing all those things, Judge. The specific testimony that she was asked at trial was, if something comes up with the treatment of a patient, do you have to get involved with that? And she testified yes. Now again, giving the plaintiffs as the non-movings the inference of that testimony, that means that she was in fact supervising their care and supervising their treatment. And I anticipate that my colleague is going to come up here and talk about the fact that argue his position is that there's no causation between their failure to have a registered nurse or a doctor. Because the law on its face is clear. And in fact, the corporate designee at the time of trial acknowledged you're supposed to have an RN or a doctor supervising the care being given by LPNs. I see a matter of time, sir. You're going to connect these four things to outrageous conduct that would have been avoided had these things been in place. In other words, this is suicide. And you're saying punitive damages are justified. But had these other things been in place, there wouldn't have been a suicide. Or at least it could have been prevented. Or steps could have been taken to prevent it that would not have resulted in a punitive damage. Yes, Your Honor. So if I start, for example, with respect to... Well, first of all, we had experts testify at trial. We had a nurse by the name of Kathy Wild and a doctor by the name of Dr. Peter Bregman. Nurse Wild testified about the violations of the Health Care Act, of the nurse practicing law. Not specifically. I'm assuming the jury was charged without objection as to causation. Absolutely. There's enough to establish causation. Instead of getting into the details in a broad stroke, she testified that the failure to properly supervise caused harm. The judge did not allow her to go to the next step. So the other expert, Dr. Bregman, was the causation expert, said that the cascade of events that started from the moment that Moomin Barbaros entered the facility on the 18th until the time of his death on the early morning or late night of the 21st, over four days, the cascade of effects, each effect caused the harm, caused him to ultimately commit suicide. The supervision... Caused him to or allowed him to, or both? Both. Well, this wasn't a suicide prevention case. The factual background of this case is when Moomin Barbaros was detained and entered into the facility, he was not suicidal. But he was taking Paxil. And you cannot, it's an SSRI, it's an antidepressant, that you cannot abruptly stop. In fact, it's known as to be one of the most dangerous drugs, that's the evidence that came out of trial, to abruptly stop. It will cause SSRI discontinuation syndrome. It's withdrawal. Then, and also because of the nature of the drug, it's out of your system within three, three and a half days. So when you restart the drug, it's like starting anew. And there are certain levels of the drug that you can start. Mr. Barbaros had been taking 30 milligrams prior to his detainment. But when you start anew, the testimony was, you have to start at 20 milligrams. Because this drug in particular is known to cause suicidal ideation. How long did he go without? Well, we know that he went without from at least the time that he entered, until the morning of the 21st. So at least from the 18th to the 21st. What is the point? If you had a licensed practical nurse, if you had a physician on duty, this would have been detected and addressed, and possibly, or probably, prevented a suicide. This is the outrageous conduct you're talking about. This is just part of it. These are the willful acts. Where they know that if they don't have this nursing staff properly supervised, it's going to create an environment where policies are violated on a regular basis. What is supervision? Was there testimony? How do we know? Should we just make it up ourselves? No, the testimony at trial was clear, that there was virtually no supervision. But what should it have been? I guess a little bit of background is necessary. But to answer your question, the supervision is you have a qualified nurse enforcing the policies. But how often is she required to review? How often does she need to be there? All the time? Part of the time? She's there. The health services administrator works in the facility and is there every single day. Are you talking about an RN or an LPN? In this case, it was an LPN. In this case, that's the problem. But what was the standard that should have been met? The standard is they should have had a registered nurse or a doctor supervising the nursing staff. Okay, but they're all the time? They're all the time. And who testified as to this? No one testified. Well, then how does the jury know? Let me step back. The level of supervision, how frequently they have to be there, there was no testimony about that. What there was testimony was that there has to be supervision by a registered nurse or a physician. Is that you say so or is there a national standard? No, that's the nurse practice, the practical nurse law. There are standards, in other words, regarding staffing of an institution like this that were violated? That's what the evidence bears out, Judge. Okay, and that was presented to the jury? You know, I've defended many medical malpractice cases years and years ago. And I was always very careful to bring in an expert on standard of care so that the jury could understand exactly what an LPN is supposed to do, what a physician is supposed to do, what a licensed nurse is supposed to do. How was the jury here able to determine what these standards were? Nurse Wild testified to them. She was qualified as an expert not only in nursing but in correctional health care. And she offered testimony that LPNs should not be supervising other LPNs. Most importantly, what she testified was that the supervision in this case was obviously deficient. Because what happened in this case is from the moment Mr. Barbaros was entered into this facility, in four days, every single person involved in his care violated multiple, at least one if not multiple policies that the testimony was from prime care itself was specifically designed to protect the health and safety of their patients. Did the judge take all this into account in addressing the punitive damages? The judge, so the way the judge addressed punitive damages was to say because he did an analysis as part of his deliberate indifference section 1983 JNOV ruling. And he incorporated that analysis into his punitive damages. And he said the logical step is if you can't make a deliberate indifference claim then you cannot make a punitive damages claim. Well, in considering the deliberate indifference claim there is a number of factors and pieces of evidence including the pieces that I just explained as willful acts that he didn't consider at all. His analysis focused on they did have proper policies in place. In fact, my expert at trial, Nurse Wild, testified I don't have a problem with the writing of the policies. The policies are fine. The problem I have is that no one enforces them. And if you're going to have policies, what the evidence bore out at trial and again, keep in mind we're reviewing the evidence in a light favorable to the plaintiffs as a non-moving party. What the evidence bore out was that they, prime care, created an environment where it became acceptable for this to happen. When Mr. Barbaros came into the facility the single most important thing was that the intake nurse and LPN take down why he was taking his antidepressant medication when he last took it and what it is. He did disclose that during the intake? What we know is that Mr. Barbaros had been taking Paxil for over 10 years and that Nurse James wrote down Prozac and Trazodone. Now, that's a mistake. That's negligent, but that is not something that the problem here. The problem is not a policy violation. The policy violation is the very next thing. When you answer that question, yes, there are two follow-up questions that are vital. When did you last take the medication and why are you taking it? And he didn't ask either of those. He admitted that when he didn't fill that out and every nurse that testified live at trial admitted that they knew that their violation put Mr. Barbaros at risk of harm. Can I just go over the big issue here I think is the punitive damages. The jury was instructed with respect to what was the basis, deliberate indifference? No, they were instructed and consistent with the Pennsylvania standard charge which is willful, wanton, or reckless indifference. So the jury was asked to find yes or no whether the defendants were willful, wanton, etc. Yes, and there was no objection to that language. How many jurors? Eight jurors. Was it unanimous? Not only was it a unanimous verdict, but it was a unanimous verdict in response to that question they answered yes. And the judge vacated that award and his rationale was? His rationale was that if you can't essentially if you can't establish, he said we could not establish any subject of knowledge on the part of prime care. He said insufficient evidence, but in his analysis he did not consider the testimony about staffing deficiencies he did not consider the testimony about the violation of the practical nurse law, he did not consider the testimony of William Bufton that prime care knowingly chose not to supervise him, and he did not consider the testimony of the nursing staff that he that they wanted doctors on the premises more frequently. It was basically insufficiency. And he compared it to three cases in particular where he said it doesn't meet those cases so I think that no reasonable jury could do this. And what became clear is that he was not he was not viewing the evidence in the lens of the jury in the light most favorable of the plaintiff because how can you not consider those factors not even address them. And so I guess I'll reserve the rest I'll reserve for rebuttal. Thank you. Please the court. I'm Robert Byer and I represent the Appalachian Cross Appellants along with my colleagues Andrew Spurl and John Moriarty. I have a couple of disagreements with my friend Mr. Chacker. First with respect to the verdict form the verdict form asked merely does the jury award punitive damages now the judge did give a proper charge on punitive damages under Pennsylvania law. After being instructed isn't that sufficient? I'm sorry. After the judge has instructed us to the standard for punitive damages why isn't that question sufficient? Well because what the judge and we're not challenging the verdict form. The judge took this was a classic case where the judge took under advisement and deferred decision on the rule 50A motion as rule 50 expressly permits. And the motion itself was made before the case went to the jury. It said that the motion was related to punitive damages that they were asking for judgment. I'm not at all sure and I know you'll disagree with me on this that the motion that you were made I assume we're talking about the same thing as the number of motions made but the specificity required for an appropriate rule 50 motion I don't see that in the remarks that the counsel made at all. Well what counsel said was that he wanted judgment as a matter of law as to punitive damages because he went further and said because the evidence did not support it. That's like saying it's snowing on the side because snow was coming down. That doesn't tell the other side anything. Well there was no objection raised as Judge Fuentes noted. Well why would someone object to the fact that his counsel his opposing counsel is not properly making a motion? Well I object you've got to properly make that motion? Well the case law and we get into this in the brief and I think Judge Mariani discusses this in his opinion as well is that a lack of specificity on a rule 50A motion is a waivable issue. Exactly but the judge is not going to say wait a minute I object. You're waiving your motion. Well if they felt that more specificity was required it was incumbent on counsel at that point to raise the issue before the judge. And this is a motion that's made at the conclusion of a trial. But why in the world would the other side say oh great he's just waived it. Then stand up and say you need to really be more specific so you can preserve that claim. Well it's not so much be more specific so you can preserve that claim it's to be more specific if we think that there's something that we could have done in the way of additional evidence. Unless they think that the statement is being made as a matter of law is insufficient to make a proper motion. Then they're not going to jump up and say judge make him make a proper motion. Well the case law would seem to suggest that in this area where somebody believes that they don't have enough information as to the basis for the motion. And again this is at the conclusion of the trial. It's right before the case goes to the jury which is timely under rule 50. If there was a feeling that maybe we had additional evidence we could introduce to support punitive damages well then again you can object to that and say I'm not sure I understand the basis for the motion your honor. But that wasn't done. Now the other thing that I disagree on is with respect to the testimony of Mr. Bufton. Judge Mariani did expressly take Mr. Bufton's testimony into account. It's quoted on page 75 of his opinion. And I might say that Judge Mariani's opinion in this case is about the most comprehensive and thorough discussion I have seen in a district court opinion in about 42 years of doing this. It was very long. It was very long. 267 pages long. District courts do not have word limits. Not yet. But he went through all of this evidence in painstaking and dispassionate fashion. And we took some lumps too in that opinion. But he analyzed the case not just saying well I'm going to take what I said on deliberate indifference and apply that to the Pennsylvania law standard. He had a separate analysis and it was very thorough in terms of the analysis of the Pennsylvania case law that controlled on the punitive damages point. I was going to ask you to be a little bit more specific because all of this was before a jury. Eight jurors. It was unanimous. The jury was instructed. The jury heard the evidence and he basically set aside the verdict of the jury. But can you be more specific? What misgivings did the judge have with respect to the jury's decision? What the judge is in effect saying is that he shouldn't have submitted that question to the jury in the first place. That it's not really so much a question of taking away a jury verdict as it is saying an acknowledgement by the judge I deferred my decision on this and now having considered it I should not have submitted that question to the jury in the first place. And his misgiving was Why would he say that? Given the evidence Maybe I misread something. There are a number of policies in place, all of them appropriate policies. Also, all of them were totally ignored when Mr. Barbaros Barbaros, I guess it is Barbaros as I understand it Mr. Barbaros came in from the time he came in the front door to the time of his death. Unless I'm missing something, every policy put in place to prevent what happened was ignored. Why isn't that enough for a jury Because what Judge Mariani found and I believe it's correct under Pennsylvania law is that that's enough to show negligence. But negligence is not enough to justify an award of punitive damages. There has to be and we're not talking about What about gross negligence? What about gross negligence? Gross negligence also is not sufficient under Pennsylvania law to justify an award of punitive damages. That's pursuant to the MCARE statute. And it's also pursuant to a Supreme Court decision. I believe it's the All House case. Reckless indifference I'm not sure to what extent Reckless indifference and gross negligence are different. But I assume there's a difference There is. And in the Martin case, the Pennsylvania HB Cole case, and both of these are cited and quoted by Judge Mariani's opinion, there are two types of reckless indifference, but only one of them will support punitive damages under Pennsylvania law. And that requires not only that there have been a conscious awareness of a risk and outrageous conduct, but that with conscious awareness of that risk, there was a deliberate decision made to go forward and act or fail to act in a manner that made that harm come about. How about if you know that LPNs should be supervised according to national standards by registered nurses? Well, the prime care knew that, made a conscious decision for saving, let's say, for economic reasons, that they would not have registered nurses supervise the licensed practical nurses. But had they done that, it might have prevented the... There is no requirement under Pennsylvania law of supervision of a licensed practical nurse by a registered nurse or by a physician. What Pennsylvania law requires... Not Pennsylvania law, but how about standard medical practices? Well, in standard medical practice there is a requirement that somebody be available for a licensed practical nurse to consult. And what Nurse Wild, the plaintiff's expert testified to, was standards in correctional institutions. But she was not permitted to testify about Pennsylvania standards or standards in the locality, because she was not a Pennsylvania licensee. There was no testimony with respect to the requirements of Pennsylvania law and the application of the LPN requirements in Pennsylvania. Now, the statute that's inside the nursing law, that's a definitional provision that doesn't speak in terms of supervision. It speaks in terms of direction, and that's defined by the regulations, and we cite these regulations in our brief, that require directions under very specific circumstances. Now, the evidence in this case shows that Mr. Bufton consulted with Dr. Thomas. He placed in an order for Mr. Barbaros to be seen by Dr. Thomas when it appeared that Mr. Barbaros was depressed. There also was evidence with respect to... I understand in some case they gave him the wrong medication. In other words, they didn't give him the medication that he needed for the problem that he was under. There was a... Well, there was a mistake made at intake where it was referred to as Prozac. We don't know why that mistake occurred. We do know that an effort was made with CVS Pharmacy to confirm what he was taking, and CVS for some reason didn't have a record. Now, that was later turned around when, again, there was a request made to the judge at his arraignment. Another effort was made for confirmation, and this time they found there was Paxil. He was given the Paxil. There was one episode... But I do know that the evidence showed that post-mortem he had a therapeutic amount of Paxil in his bloodstream. I don't think that is known, Your Honor. At least, I don't know that there's anything in the record that would allow for a conclusion on that. And again, Judge Mariani was very careful in his analysis. He said, But you have to show corporate knowledge because punitive damages here are not based on a respondeat superior basis. This is based on corporate liability, and you need to show that something has gone on that would have put the corporation itself on notice of the risk with respect to Mr. Barbaros. And the case law is fairly... I could be mistaken in what I read, but I thought that there were complaints had been made over the shortage of nursing staff generally, and maybe supervisory nurses. But what the evidence also showed was that the staffing decisions were made pursuant to a contract between PrimeCare and Monroe County. Remember, PrimeCare was in there as a contractor for Monroe County. Monroe County controlled the staffing, and Monroe County was a defendant originally, but then the plaintiff settled with Monroe County. And Judge Mariani did not allow any evidence with respect to a lack of staffing for that contract, and this was not chargeable to PrimeCare. Now, PrimeCare had... the evidence shows that there was a physician's assistant available for consultation. Dr. Thomas was available to consult. Mr. Bufton worked for another contractor, and in the testimony that Judge Mariani cites, he said he couldn't speak to what PrimeCare knew or didn't know with respect to what he was doing. And PrimeCare, of course, didn't have the duty to supervise him because they had contracted with somebody who was supposed to do that. So lack of staffing was not an issue? Lack of staffing really was not an issue, and there was no showing as to how that could have been causally related. But even apart from that, there's no showing of... I mean, when you talk about the case law on lack of staffing in Pennsylvania, and these are all cited in the brief and discussed in the opinion, you're talking about situations where, for example, in one case, the patients who were suffering, they were in horrible circumstances that existed for months, and when inspectors would come in, all of a sudden staffing was increased so that it would appear that there was adequate staff present. That was, I believe, either the Scampone or the DuBose case, both of which are cited here. All of the Pennsylvania cases where punitive damages have been  there's been a lack of staffing. It's a situation where the problem has existed for some time, not a period of just four days involving a single person, but a pattern or practice or prior circumstances, prior events. But you would agree that there could be a situation. I know you wouldn't agree this is the situation, but you would agree that there could be a situation where the amount of willful neglect is such that after four days, it's enough for punitive damages. But you would need the show more than what was present here. But the fact that it's a short period of time here, I mean, there's not a license to commit wrongful or willful misconduct. It's not that, well, I've got five days to mess up, and then after that, I've got to be careful. That's correct, but the evidence here shows that every time somebody, that Mr. Barbaros made a complaint that he needed something, that it was fulfilled. That he would go to the nurse and complain, and he said he had a stomach ache. He said that they determined his blood pressure was high. Steps were taken. We're talking about seven encounters, I believe, over a period of four days. He complained about lack of medication, didn't he? Did he complain about lack of medication? At one point, he did to the judge, and that's when they made another phone call, and at that point, it was verified. He said he complained to the judge. At his arraignment. Mr. Barbaros complained to the judge at his arraignment. That was reported back, and steps were taken, and they were able then to make the confirmation, and then contacted the psychiatrist who was on contract, Dr. Thomas. I'd like to hear about the jury instruction, too, before your time is up. Go ahead. Go ahead. I have a question after you answer. The jury instruction on punitive damages was in accordance with Pennsylvania. It talked about reckless indifference. Negligence per se. On the negligence per se instruction, in short, this was not a case where negligence per se should have gone to the jury on the basis that we normally think of it, and the judge even acknowledged that, and that's why he cut down the instruction in part. He didn't give the full negligence per se instruction from the standard jury instructions, but we think it was done in a way that resulted in confusion because you have, first of all, closing arguments, and Mr. Chacker made a very effective closing argument to the jury, stressing his theory that there was a violation of the nursing law. Now, the judge wouldn't charge on that as normally would be contemplated because he said there was no testimony showing a violation of the nursing law or linking that in a causal fashion to what happened here, but he then decided to go ahead and give the instruction that we objected to, which basically just defined under the heading negligence per se. This went to the jury in writing as well as being orally delivered with that heading in there, negligence per se, and this came after the instructions on negligence, followed by an instruction on causation, and then this negligence per se instruction or definition of the statute is inserted at that point, and the jury could well have thought, particularly in light of the closing arguments and the emphasis that was given, that this was some different category that didn't require reference to causation. Given the way the evidence... Would it be relevant what the nursing regulations and statutes for standard of care are without putting it in negligence per se format, just letting the jury know something in terms of what an appropriate standard of care might be? We would think not, Your Honor, in the absence of evidence really linking that up because that could be misused by a jury. It could result in confusion, and the jury really requires guidance in these situations as to what these standards mean, how they apply. They could conclude that the standards were appropriate and followed and make a decision in your favor. They could, but... Standards help the jury determine whether something was wrong. They could also get the state nursing standard conclude it wasn't met, but nevertheless they weren't trying to find negligence, which makes it very different than negligence per se. But there was no evidence of an expert nature here that the state nursing standard wasn't satisfied, and there was no evidence here that would support a conclusion that LPNs were doing anything that they weren't permitted to do under state law. And there is no requirement, again, in state law that LPNs be supervised. It's just they're required to take direction under certain circumstances, and that was done here. Take direction from whom? From a registered nurse or a physician or a dentist, actually. And was there a registered nurse or a physician here that... There was a physician here, and then also there was a physician's assistant who acted for the physician who was able to consult by telephone with two nurses, Nurse Ramos and Nurse Rowe, when help was needed. Oh, in general or in theory or particularly with regard to Mr. Barawos? I keep mispronouncing the name. Barbaros. I'm sorry, Your Honor. Are you saying they're available to give advice and guidance in general or in theory as needed or specifically with Mr. Barbaros? They were there when needed, and they gave it specifically with Mr. Barbaros. There was a prescription phoned in by Dr. Thomas. There was another prescription phoned in by the physician's assistant, and the evidence shows, and the judge outlines this in his opinion, Judge Mariani was very thorough on this, that any time Mr. Barbaros had a complaint, there was a tension. That's one of the reasons this was not a deliberate indifference case under federal law. I didn't get that impression from what I read, but I did want to ask you a question about the punitive damages. Is this a state law issue? Correct, it is solely a state law issue. What does the state say about vacating an award of punitive damages? Is there a standard involved? The state deals with that as a de novo matter on appeal, and there are cases, and we've cited them in our brief, and Judge Mariani cites them in his opinion, where the state Supreme Court or the state Superior Court have vacated punitive damage decisions because they were inappropriate, and there are also situations where they've reinstated where they were appropriate. If you just say it's inappropriate, is that... Well, when the legal standard hasn't been met... What is the legal standard? The legal standard requires, and this is in the SHV Cole case, that, first of all, that punitives are reserved for extreme and exceptional cases, and it's where the plaintiff introduces evidence that the defendant had a subjective knowledge of a substantial risk of harm to the plaintiff and acted outrageously or outrageously failed to act in conscious disregard of that risk. It is an actual knowledge standard, and the Supreme Court of Pennsylvania, as outlined in the Martin and SHV cases, has rejected the notion that this could be based upon what the defendant should have known. And here we're talking about the corporate defense. That sounds like the standard to award punitive damages. I was asking about the standard to vacate and award punitive damages. What the court looks to is whether the evidence was sufficient to allow a conclusion to be reached that that standard that would justify punitive damages was satisfied. They deal with this strictly as a matter of law. It does sound like a jury question. If properly charged, the jury takes all the evidence. This was a 7-day trial? Well, there's a threshold question of whether it should go to the jury, and that's what the Pennsylvania courts have dealt with, and that's what Judge Mariani was dealing with here. Thank you. There are a couple of factual issues that my colleague... ...need to correct, just for the court. First off, I want to start with SHV Culp, because the important factor that was not mentioned just now is that the Supreme Court of Pennsylvania specifically held that the determination of whether a defendant's actions are reckless lies within the sound discretion of the fact finder. And so, as long as we meet the minimum quantum of evidence, and I think one of the most important things here is that the issue before the court is not whether I believe punitive damages were appropriate or even whether Judge Mariani agrees that punitive damages were appropriate. It doesn't matter if anyone, with all respect to the court, whether we all think, whether we feel under these facts that we would award punitive damages. That's not the question. The question is if we give a reasonable inference of every fact here to the plaintiff, if we show that there was improper staffing, if we believe that the nursing staff complained of improper staffing, if we believe that they complained about doctors... I thought staffing wasn't an issue. Staffing was an issue, and with all due respect to my colleague, there was absolutely no evidence at trial that the standards for staffing were governed by a contract. What happened was when I questioned Ms. Ramos, the nurse, who made the complaints about staffing and testified that all the nurses were complaining about staffing, counsel for prime care stood up and objected. And objected in front of the jury and said, Judge, staffing minimums are set by Monroe County. And that was the argument. And my response was, well, they may set standards, but that doesn't mean that that's what's required. If medical care is needed and more staff is required to satisfy that medical care,  That was argument in front of the judge, Your Honor. There was no testimony from either the corporate designee or anyone else that the minimum standards for staffing were set by Monroe County. Was that established in the settlement with Monroe County? No. Monroe County was settled with because there were actions of some correctional officers that we had some complaints about, Judge. That had nothing to do with the medical care. So the point is, if there's staffing issues, if there's issues about doctors, if there's issues about supervision of the only mental health worker at the facility, if there's issues about... Let me get back to staffing. If prime care felt more staffing was necessary, could they have hired more people? Absolutely. Under their contract with Monroe County? Absolutely. Like I said, there was no testimony about the contract with Monroe County. But what there was was questioning of Ms. Ramos who said we asked for more staff. That doesn't mean that prime care could have given her more staffing. Well, the way it works, Your Honor... If prime care had a contract that said they had to provide the medical care with the staffing provided by Monroe County, then how can you hold prime care liable for not increasing staffing if it was Monroe County that had to increase the staffing? I can only say that there's no evidence that that was the case, Judge. And the only evidence that was presented at trial was that there were complaints about staffing and the testimony was that prime care said, you're fine, you can get the work done. And was there evidence that prime care could have increased the staffing? No. There was no evidence either way, one way or the other, Judge. But again, when we look at that fact, that wasn't an issue. That's not inferring the facts in the light most favorable to the plaintiff. Well, but there is a link in there... If I may, and I apologize for interrupting, Judge. But if I may, the testimony at trial bore out that the lack of staffing did play a role in causing the death here. Because first, the intake nurse that evening testified that he was very busy. Now, that alone, view it in the lens of there's a nurse who comes in and says, we made repeated requests for additional nursing and prime nursing staff on shift and prime care refused. You have then the evening nurse saying, I was very, very busy. His responsibility was to gather sick call notes, sick call requests, and put them with the charts. There is a nurse, Roe, who actually saw Mr. Barbaros at sick call. She did not have his medical chart. Violation of a policy designed to protect and keep patients safe. What she testified to is that she worked there for a year and a half. And over that year and a half, it was very normal for her not to have the chart. That's another violation. And the reason is because she doesn't have a full picture of the patient's background. If those two things weren't enough, the most important person who testified was Nurse Bauer. She was the person charged with verifying the medications the day after Mr. Barbaros came into the facility. If she did her job, if she had the time and ability to do her job, we're not standing here and sitting here today. And what she testified was, everyone acknowledged there were four ways to verify medications. The patient brings them in, you call the pharmacy, you call the family doctor, and even though those fail, you call the family and say, can you bring the medicine in? And what Nurse Bauer said, in fact, all the nurses confirmed that no one ever follows that policy. Never. They call the pharmacy and if you get verified, good for you. And if you don't get verified, and what Nurse Bauer said is, I did my job. I called the pharmacy. Next person, if they have time during their shift, they can make more phone calls. That is clear evidence that she doesn't have time because there's not enough staffing to comply with a policy that would have saved this man's life. The judge, in this case, going back to the judge's decision. Yes. It seemed like he made it on the spur of the moment. He was unsure whether to charge a jury as to punitive damages or not. I didn't... Being there, that was not the sense I got. Yeah, as a district judge, I often reserved ruling on motor vehicle accidents. Of course. Because it may save you a lot of trouble. Absolutely. What I will say is, and if I may, I see that my time's up, if I may. Go ahead, I've got one more question for you. Sure, I'm happy to answer. Well, there was representation made that every time, or any time was the word, not every time, any time Mr. Barbaros made a complaint that was addressed. I assume you wouldn't agree with that. I do not agree with that. Did he complain? Number one, the absence of a complaint might be symptomatic of his mental illness. But did he complain? Sure. So, to answer the question, there was a mention of seven contacts. There were actually only three contacts in the truest sense. So when he first came in at intake, there was no reason to complain. So he did not complain. That was on the 18th. On the evening of the 19th, he developed a headache and his ulcer, his stomach started acting up. He put in a sick call slip and he was seen the next day by another nurse. And when that nurse saw him, she did not have the medical chart. Should she have had it? Absolutely. That's policy. Not only is she supposed to have it, she's supposed to review it. So when she didn't see the, if she had seen the chart, our position is she would have seen, they didn't know when the last time this man took his medications or why he was taking them. At that point, did they know what the correct medication was? No, it hadn't been verified. This is all part of the chronology. So the medicine hadn't been verified because the policy hadn't been followed because it's never followed. He starts to develop a headache. Our expert testified these are signs, you're starting to show signs of withdrawal. When Mr. Barbaros showed up to his sick call appointment that next morning, she didn't have the chart, the nurse, but she pulled out a form for sick calls, for headaches. There were repeated mistakes and missing information in that form. For example, she designated Mr. Barbaros as a female, just as a simple thing. The referrals weren't made. She didn't know when the headache started. But she did take his blood pressure and his blood pressure bordered on what's called malignant hypertension. Where's the blood pressure? The blood pressure was 180 over 130. And slightly higher than that, this man has to be rushed to the hospital. That was the testimony that came out at trial through the defense expert. So what happens is, she asked him, are you taking any medications? And he says no. But within two to three hours, or three or four hours of this visit, Mr. Barbaros was at court, begging a judge to help him get his medications. There's an inconsistency there. Did she really ask him? Or did she just not ignore his request? Either way, it was a violation. That's right. And then when he returned, because of his complaints, the judge asked the sheriffs transporting him, when you get back to the facility, can you please make sure something gets done about this? So the sheriff goes to the health services administrator. The person charged with making sure policies for prime care are enforced at this facility. And says this man hasn't had his medications verified. The nurse supervisor pulls the chart. The first person to actually look at the chart. And here's what she realizes. And I should add this. Before this even happens. After that sick call, because the nurse didn't have the chart, at some point she had to go find it. And she did that about two hours later. Around two o'clock. And the policy dictates that when you find this chart, she looked at it and she admitted on her testimony. She admitted that she saw that the medications hadn't been verified. She knew that she had an obligation to make sure that if policy wasn't followed, that someone took the next step to protect the patient. She knew that if she didn't do that, it would put the patient at harm. And she still chose not to take any act to verify the medications. Then we fast forward to the health nursing supervisor. And when she got the file, she was the first person to actually review the chart in its entirety. And she testified under oath that she saw that her nurse, the intake person, had violated policy by not filling out the chart. She saw that the medications hadn't been properly verified per policy. She saw that the nurse who had just seen him didn't follow policy. And the more important thing here is she knew that no one knew the last time Mr. Barberos had taken his medication. She knew that her staff, she also testified, that she wasn't familiar with the medication or its side effects or how long you could be without it. She testified she, even though it's policy that you're supposed to look it up, she didn't bother. Okay, let me ask you a question about, punitive damages have been awarded only against prime care, right? Yes, Your Honor. And that requires that not the individual employees at prime care, but the administration running prime care has to be aware of Mr. Barberos and his problems. Not Mr. Barberos specifically, but the risks posed by their failure, their deliberate choices. So there's no requirement that they be aware at all about Mr. Barberos, is that... My view of the, my interpretation of the law judge is that they have to show that their decisions are recklessly indifferent to a harm. That harm, Mr. Barberos falls within the group of people that would be victims of the harm as a result of prime care's decisions. Does that answer your question? Yeah, you say it's your view. Are there others who have different views on this? No, the case law, the standard is the standard. Yeah, what's the case on that? So the preeminent cases in Pennsylvania are Hutchinson, X. Rel. Hutchinson v. Luddy, 870A2nd 766, SHV Cole, which you had heard before, which is 587A2nd 702, Martin v. Johns Mansville Corporation, which is 494A2nd 1088. Those would be the cases that will set forth the standard in Pennsylvania for punitive damages. Feld v. Merriman is another one. I have the site, if I may. But that's not just the standard, but for the standard when you are calling for punitive damages against a corporate entity, who has to be aware of what's going on? So I would say in that context, I would also look at the Scampone decision. Who was that again? Scampone v. Green, which is one example. The site for that, Your Honor, is 11A3rd 967. Those would be the leading cases. And keep in mind, the Scampone case, the Hall case, and even the DuBose case, which is another case, which is a Pennsylvania Superior Court case, 215PA Super 223. They're all nursing home cases. To my colleague's point, they're all nursing home cases where the care was over a long period of time. I would submit to the court that Mr. Barbaros didn't have the opportunity to be neglected for a long period of time. The neglect in this case was so severe over such a short period of time that he killed himself not just in a normal way, but by everyone's agreement in one of the most unique, horrific ways that they had ever heard. Directly related to the withdrawal and directly related to the overdose of the medication that he was given. You're saying an overdose of the medication? Or because he had been discontinuing it for a while? That's the testimony from Dr. Bregan. Because if you look at it, when Nurse Johnson, the health supervisor, got a hold of this case and assigned it to Nurse Ramos, the next nurse, she had an obligation to communicate. This goes back to the point of the supervision. An RN or a doctor makes sure that someone they're tasking a point to, they've got additional education to understand the importance of assessments. That was the expert testimony from Nurse Weill. They know that if you're going to task a nurse to verify a medication, you know that you have no idea when the last time that medication was taken or what its side effects are. You have an obligation to make sure that the people you're charging that could potentially save your patient's life know, I don't know the side effects. You better look them up if you don't know them. Excuse me. You're going from gross negligence to reckless indifference. Somewhere in there. Sorry, you crossed the line, but I'm not quite sure where. Well, and isn't that the point, Judge? That's my very point. The issue of deciding whether we cross the line or not is not for me or Counsel for Prime Care or even Judge Mariani to make. Or this panel. Or even this panel. That's my point. It's the jury's decision. Is it only gross negligence? Does it not merit punitive damages? If that's the jury's decision, that's the jury's decision. But at a minimum, especially if you consider one of the cases cited by Judge Mariani's decision and I gave you the cite for it, it's Judge DuBose. I'm transliterating here. It's the DuBose versus Quinlan case. It was a nursing home case. There was zero testimony about staffing issues or supervision. There was no expert testimony mentioned in the opinion. The only thing mentioned in the opinion was clear, repeated neglect. And that's what we have here. There was testimony. I have a note here that as many as a dozen policies were violated by Prime Care. When we're talking about policy, we're talking about all these things that you are now mentioning, supervision, failure to recognize medical needs. Is that right? Yes, Judge. You have testimony. Keep in mind that all of the testimony about policies came through either the health services administrator, the nurse supervisor or the corporate designee. And the policies are if someone comes in to verify medications, there are the four ways we discussed. And the testimony from three of the nurses is no one ever follows it. Other than calling the pharmacy, no one does anything. Testimony was that you are required to have for every sick call visit the chart so that you have a picture of your patient's history. And there's testimony from one of the nurses that it was very normal over a year and a half not to have the chart. There is testimony that if you come into a facility regarding medication verification on mental health medications and you can't verify the medications, by the end of the net close of next business, you are to call the on-call psychiatrist. Didn't happen. There's a policy that you're supposed to complete. Remember, the difference between an LPN and an RN are the tasks that they can perform. This testimony came out through the nursing expert that I presented as well as through the corporate designee who is an RN in his own right. They are allowed to collect information as an LPN. And even that they didn't do right here because the intake wasn't completed. Violation of a policy. So if you look through, even the health supervisor violated policy. If even the supervisor is violating policy, and I will point out, my colleague mentioned that they had a physician, a medical director on staff, Dr. Wilson, who testified. And her testimony was probably some of the most damning during the trial. Because she says, I have no responsibilities at all to supervise anyone. Who is this? Dr. Wilson is the designated medical director at the facility. What are her responsibilities? She's a doctor. She testified, I work as a doctor. If policies come in, I skim them maybe and I sign them. She's a medical director at three prime care facilities. When I questioned the corporate designee about who's supervising your nurses at other facilities, how many other facilities do you have LPNs supervising your nursing staff? He couldn't give a number. But he said, I can't give you a number, but it's definitely at multiple facilities. Where do these policies come from? So what they told, the testimony again, this is from the corporate designee and even from their own nursing expert, their policies mimic the National Commission on Correctional Health Care's policies. And what they both testified, both the corporate designee and their nursing expert, was that these are the minimum acceptable policies. And that's significant. Because if the testimony is that you know that the policies are designed to protect the health and safety of your patients and these are the minimum acceptable policies and your people are repeatedly violating them, you're making, and you're not doing anything about it because there was testimony at trial that they have a CQI policy, but that was impeached. What's CQI? Continuing Quality Improvement. That was Prime Care's testimony. And I only mention this because I know that it's mentioned in their brief and they try and rely on it. And my point is, under the decision, the Reeves v. Sanderson Funding Products Incorporated case, the United States Supreme Court said that you cannot consider, in ruling on the JNOV, you can only consider evidence from the moving party that is uncontradicted, unimpeached, at least to the extent that the evidence comes from a disinterested witness. There were no disinterested witnesses. We've let you go quite a while. I guess I didn't mean to cut you off. Thank you. We do understand your opinion. We obviously let him go quite a while. We didn't cut you off either. He probably gets that from his dad. Thank you.